DECISION
Plaintiffs appeal the Marion County Board of Property Tax Appeals (BOPTA) Order, dated February 14, 2011, sustaining the 2010-11 real market value on the tax roll of property identified as Account R91480 (subject property). A telephone trial was held on June 23, 2011. Christopher K. Robinson, attorney at law, appeared on behalf of Plaintiffs. William E. Leavens (Leavens), Oregon and Washington certified general appraiser, and Kirk Ward (Ward), Norris Stevens, testified on behalf of Plaintiffs. Scott A. Norris, Assistant Legal Counsel, Marion County, appeared on behalf of Defendant. Tom Rohlfing (Rohlfing), senior property appraiser and Oregon registered appraiser, Marion County, testified on behalf of Defendant.
Plaintiffs' Exhibits 1 and 2 and Defendant's Exhibit A were received without objection.
After a brief discussion, the parties agreed that Plaintiffs could submit additional evidence no later than July 6, 2011, and Defendant could respond to Plaintiffs' evidence no later than July 19, 2011.
 I. STATEMENT OF FACTS
The parties agree that the subject property, also known as the Clark Creek Apartments or Clark Creek Village, is a 42 unit building constructed in 1994; each unit has two bedrooms and *Page 2 
one bathroom with approximately 857 square feet of living space. (Ptfs' Ex 1 at 15, Def's Ex A at 4.) The property is located in south Salem, Oregon. (Id.) Each unit provides a covered parking space; there are 21 additional uncovered spaces. (Ptfs' Ex 1 at 17.) Leavens testified that the subject property is in "average condition" whereas Rohlfing testified that the subject property is "well maintained" and is "above average to good condition." Both appraisers inspected the subject property, viewing both the exterior and interior of the building, and took photographs. Both parties concluded that the highest and best use, vacant and improved, was a use described as "a moderate density residential development (primarily multifamily)" or "as multi-unit residential." (Ptfs' Ex 1 at 30; Def's Ex A at 10, 11.)
Using the income approach, the parties determined comparable net operating incomes. Leavens determined a net operating income of $183,375 and Rohlfing determined a net operating income of $178,610. (Ptfs' Ex 1 at 39, Def's Ex A at 23.) The capitalization rates and property tax rates determined by the parties are not comparable. Leavens and Rohlfing testified how each determined a capitalization rate, describing in detail the comparable properties each selected. Leavens testified that he relied on five sales of properties that he identified were comparable to the subject property to determine a capitalization rate of 7.5 percent. (Ptfs' Ex 1 at 40.) Defendant expressed concern that two of Leavens' five comparable properties were located in Albany and Springfield. Those markets have their own characteristics, which are not necessarily the same as the Salem market. Leavens defended his choice of comparable properties, testifying that it is "customary to go outside the immediate market" when there are few sales and the selected properties are comparable to the subject property. He testified that, if those two sales were removed, the capitalization rates would range from 8.12 percent to 9.01 percent. (Id. at 39.) Defendant also expressed concern that Plaintiffs' comparable properties were sold after the *Page 3 
January 1, 2010, assessment date, and that were some built many years prior to the subject property. (Ptfs' Ex 1 at 39, 40.) Defendant also was concerned there was a lack of unit size comparability. (Id.)
Rohlfing relied on four sales that he determined were comparable to the subject property to determine a capitalization rate of 6.27 percent. (Def's Ex A at 23.) He testified that he subsequently selected a capitalization rate of 6.38 after consideration of information prepared by Powell Valuation Inc. (See Def's Ex A at 32.) Plaintiffs expressed a concern that the one comparable sales that Rohlfing concluded was the "best indicator of value" closed before the "disruption of the capital markets in 2008." Rohlfing testified that even though there was no "visible" adjustment for the market conditions that specific comparable property was "inferior in income and location" to the subject property, explaining that the comparable property abutted a "Dairy Queen order out menu" and was close to "River Road traffic." He testified that in selecting his comparable properties he "paid attention to the local market."
In computing the tax rate to add to the determined capitalization rate, Leavens testified that the "levied property tax rate" of "1.85 rounded" was added to "the previously concluded rate of 7.50%" for an "Overall Loaded Capitalization rate [of] 9.35%." (Ptfs' Ex 1 at 41.) Rohlfing testified that "Marion County used 1.5% from their 2010-11 mass appraisal setup study for accounting for the taxes in the overall rate" and determined an overall capitalization rate of 7.88 percent. (Def's Ex A at 24, 25.) He testified he agrees with Plaintiffs'"1.85 property tax rate" but he used "1.5 percent property tax rate," stating that he has "limited experience in *Page 4 
income approach for apartment complexes" and he gave more weight to the sales comparable approach. Plaintiff pointed out that Rohlfing's testimony is contrary to his appraisal report, stating:
 "In this case I believe, the comparable sales are a good indication of value, however most of the weight was from the income approaches for a value estimate of $2,400,000."
(Def's Ex A at 24.)
In response to Rohlfing's testimony that he gave more weight to the sales comparable approach, Ward testified that, "during the time period" near the valuation date, January 1, 2010, investors "were risk adverse, everyone was extremely cautious" and "the sales comparable approach meant nothing" — investors were only looking at "actual income and expenses to the exclusion of anything else." Ward testified that the "market conditions for apartment complexes were a lot like the residential market" and apartment complexes were worth "a lot less from 2008, when there was a strong apartment market, to 2010."
Using the income approach, Leavens determined an indicated real market value of $1,960,000. (Ptfs' Ex 1 at 51.) Rohlfing determined an indicated real market value of $2,266,624. (Def's Ex A at 24.)
Using the comparable sales approach, including properties that were previously described in detail, Leavens determined an indicated real market value of $2,100,000 for the subject property. (Ptfs' Ex 1 at 50.) Converting each of the sales of the comparable properties to a "price per unit," Leavens' determination was based on $50,000 per unit for the subject property. (Id. at 49.) Rohlfing determined an indicated real market value of $2,730,000. (Def's Ex A at 24.) In determining that indicated real market value, Rohlfing relied on the July 1, 2008, sale / / / / / / *Page 5 
of one, Shoreline Point, from the five comparable properties. (Def's Ex A at 15.) That price per unit, $65,000, was the lowest of the five comparable sales. (Id.)
Both Leavens and Rohlfing determined an indicated real market value using a gross rent multiplier (GRM) or potential gross income multiplier (PGIM). (Ptfs' Ex 1 at 40, 43; Def's Ex A at 24.) Leavens concluded "a PGIM of 6.5* * * for the subject. With potential gross income estimated at $319,380, this results in a value indication of $2,075,000." (Ptfs' Ex 1 at 49 (emphasis omitted).) Leavens's potential gross income is supported by his comparable rent analysis. (Ptfs' Ex 1 at 33.) He compared the subject property's "achieved rents" to four other apartment complexes that offer two bedroom units and concluded that "the estimated rent has been effectively achieved at the subject, therefore, considered to be a reflection of market for the subject." (Id.) Rohlfing determined a potential gross income of $315,000 and a gross rent multiplier of 9.42, based on the sale one of five comparable properties, the 24 unit Shoreline Point built in 1996 and sold July 1, 2008. (Def's Ex A at 15, 24.) Rohlfing's indicated real market value for the subject property was $2,967,300. (Def's Ex A at 24.)
Plaintiffs' requested 2010-11 requested real market value for the subject property is $2,090,000. (Ptfs' Ex 1 at 50.) Defendant's requested 2010-11 real market value is $2,400,000. (Def's Ex A at 1, 24.)
 II. ANALYSIS
The issue before the court is the 2010-11 real market value of Plaintiffs' property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments."Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 *Page 6 
at *2 (Mar 26, 2003) (citing Gangle v. Dept. of Rev.,13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [1] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."
There are three methods used to determine real market value: (1) the cost approach, (2) the sales-comparison or comparable sales approach, and (3) the income approach. Allen v.Dept. of Rev.(Allen), 17 OTR 248, 252 (2003).See also OAR 150-308.205-(A)(2) (stating that all three approaches to valuation of real property must be considered, although all three may not be applicable to the valuation of the subject property). The parties agreed that, given the date of the subject property's construction, the cost approach is not applicable. Leavens wrote:
 "The Cost Approach was not presented in this appraisal due to the subjectivity and difficulty in determining accrued depreciation for older buildings."
(Ptfs' Ex 1 at 9 (emphasis in original).) Rohlfing testified that Defendant is "always required" to "carry a cost approach to split the land and improvement values even though [for the subject property] it is unreliable."
A. Comparable Sales Approach
If there is relevant comparable sales information, the sales comparison method is used in the process of determining real market value. Swenson v. Dept. of Revenue,276 Or 1, 4, 53 P2d 351 (1976). The sales comparison approach can also be used to support the conclusions of the income approach. Appraisal Institute, The Appraisal of Real Estate
301 (13th ed 2008).
Both parties valued the subject property using the comparable sales approach. Each appraiser relied on the sale of properties he identified as comparable to the subject property to *Page 7 
compute a potential gross income multiplier or gross rent multiplier and price per unit. (Ptfs' Ex 1 at 49; Def's Ex A at 15.) Each appraiser computed an indicated real market value using the multiplier and price per unit. (Ptfs' Ex 1 at 50; Def's Ex at 15.) Their indicated values were substantially different and can be tied to the characteristics of their comparable properties.
Of the five properties Leavens identified as comparable, he selected three properties built in the 1970s (although one property was remodeled), and two properties located outside the Salem market. (Ptfs' Ex 1 at 44, 49.) The properties varied in unit size from 20 to 103 units. (Id.) All sales of properties selected by Leavens occurred in 2010 except one that was sold in February 2009. (Id.) The closest sale to the assessment date occurred in April 2010; the property was built in 1972 and is located in Salem. (Id.) That property consists of 20 units, averaging 558 square feet. (Id.) Leavens wrote:
 "Overall, despite the smaller development size, the inferior age and condition and inferior unit mix makes this a high indicator for the subject."
(Id. at 40.) Leavens's statement is confusing and does not support his conclusion with respect to comparability to the subject property.
The court concludes that Leavens's choice of properties as comparable to the subject property are not comparable. He failed to select properties in the Salem market area that were built close to the date of the subject property and of comparable unit size. In contrast, Rohlfing identified five properties in the Salem/Keizer market area; three were built in 1996, close to the date the subject property was built. (Def's Ex A at 15.)
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief." ORS 305.427. Plaintiffs must establish their claim "by a preponderance of the evidence, or the more convincing or *Page 8 
greater weight of evidence." Schaefer v. Dept. of Rev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. of Rev.,4 OTR 302 (1971)). In this case and with respect to the comparable sales approach, Plaintiffs have not met their burden.
B. The Income Approach
The income approach "relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream [the property] produces." Allen,17 OTR at 253 (citation omitted). The income approach is widely used when appraising income-producing properties. Although there are two techniques for determining the expected future income, direct capitalization and discounted cash flow, both appraisal reports relied upon the direct capitalization analysis approach to determine the subject property's real market value. LFCG, LLC v. ClackamasCounty Assessor, TC-MD No 080529D at 12.
The income approach determines the flow of income that a reasonable and knowledgeable buyer would anticipate if purchasing the subject property on the assessment date. PacificPower Light Co. v. Dept. of Revenue,286 Or 529, 542, 596 P2d 912 (1979). The income approach should also consider the past earnings of the subject property and the rate of change of its income. Id.
To determine a property's real market value, the direct capitalization analysis divides the forecast net operating income of the property for the tax year by the capitalization rate. The parties' computed similar net operating incomes. Leavens determined a net operating income of $183,375 and Rohlfing determined a net operating income of $178,610. (Ptfs' Ex 1 at 39, Def's Ex A at 23.) Even though Rohlfing used a different property tax rate, he agreed with Leavens' property tax rate of 1.85. *Page 9 
The main difference between the parties' income approach is the capitalization rate which is directly related to each appraiser's choice of comparable properties. To develop a capitalization rate, Leavens relied on the same five properties used with his comparable sales approach. The overall capitalization rates for those five properties were described as "a relatively wide range 6.98% to 9.01%, and are located in the immediate and extended market areas." (Ptfs' Ex 1 at 39.) Leavens concluded that "the subject is best bracketed between 6.98% and 8.12%," stating:
 "Considering the subject's location, moderate anticipation for increasing rents and overall appeal at the date of value, an adjusted rate (without taxes) within the middle to upper portion of this range is reasonable and credible. Therefore, a capitalization rate, via the market extraction method, of 7.50% is concluded for the subject property."
(Ptfs' Ex 1 at 40 (emphasis in original).) Rohlfing relied on four of the five properties identified as comparable to determine an overall direct capitalization rate of 6.27 percent. (Def's Ex A at 23.) However, without a written explanation as part of his appraisal report, Rohlfing concluded that the direct capitalization rate was 6.38 percent. (Id. at 24.) Of the four comparable properties, with the exception of the sale of an 18 unit property, the closer the date of sale was to the assessment date, the higher the capitalization rate. (Id. at 23.) Based on the testimony and evidence, the court concludes that the capitalization rate as of the assessment date is close to 7 percent before adding a property tax rate of 1.85 percent to determine an overall capitalization rate.
The court concludes that, using an income approach, the indicated value of the subject property as of the assessment date was $2,100,000.
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that the subject property's real market value as of January 1, 2010, is $2,100,000. Now, therefore, *Page 10 
IT IS THE DECISION OF THIS COURT that the tax year 2010-11 real market value of property identified as Account R91480 is $2,100,000.
Dated this ___ day of August 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This Decision was signed by Presiding Magistrate Jill A.Tanner on August 31, 2011. The court filed and entered this Decisionon August 31, 2011.
[1] References to the Oregon Revised Statutes (ORS) are to 2009. *Page 1